UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Sarah's Hat Boxes, L.L.C.**

   **v.**                                   Case No. 12-cv-399-PB
                                      Opinion No. 2013 DNH 058

**Patch Me Up, L.L.C. et al.**


**MEMORANDUM AND ORDER**


    Sarah's Hat Boxes, L.L.C. ("SHB") sues Patch Me Up, L.L.C.,
L'Artisane Box, Peter Semenoff, and Debra Mangum, alleging that
the defendants stole business from SHB by making false claims on
their website about the source, quality, and patent status of
the hat boxes listed for sale.  SHB brings claims under the
Lanham Act and the New Hampshire Consumer Protection Act
("CPA").  SHB also alleges common law tortious interference with
a contractual relationship.  Defendants move to dismiss SHB's
claims, arguing that: (i) the court lacks personal jurisdiction
over the defendants; (ii) venue is improper; and (iii) plaintiff
has failed to state a viable claim for relief.  For the
following reasons, I deny defendants' motion to dismiss on
personal jurisdiction and venue grounds.  I also conclude that
plaintiff has stated plausible claims under the Lanham Act and
the CPA.  I dismiss plaintiff's tortious interference claim.

## I.  BACKGROUND[1]

SHB, formerly Old Mills Box Company, began manufacturing and selling hat boxes in 1986.  Since 2006, SHB's hat boxes have been designed, manufactured, and shipped from its office in Hancock, New Hampshire.  Most sales are completed online through SHB's website.  The website allows customers to choose from various box sizes, shapes, and fabric coverings.

Patch Me Up, L.L.C. ("PMU") began operating in 2000.  The company sells spa products, such as moisturizing lotions and scented oils.  PMU began buying SHB's hat boxes in the summer of 2009 to use them as packaging for their spa products.  L'Artisane Box is a division of PMU that offers hat boxes for sale online.  The principal place of business for both PMU and L'Artisane Box is Millbrae, California.  Peter Semenoff is the president and registered agent of PMU.  Debra Mangum is the founder and vice-president of PMU.  Both Semenoff and Mangum reside in California.

In the summer of 2009, Mangum contacted SHB to purchase hat

---

[1] The facts in this section are drawn primarily from the amended complaint (Doc. No. 8) and SHB's objection to defendants' motion to dismiss (Doc. No. 9) and are considered in the light most favorable to the plaintiff.

boxes wholesale on behalf of PMU.  Mangum told SHB that PMU
intended to use the hat boxes as packaging for its spa products.
Between July 2009 and March 2012, PMU ordered approximately 900
boxes from SHB on at least eleven separate occasions.  At the
bottom of nine out of eleven of the invoices included in the
shipments from SHB to PMU, SHB wrote, "Buyer agrees that in the
event suit is brought or commenced in connection with any matter
involving the contract, said suit shall be brought in the courts
of the State of New Hampshire."  The defendants negotiated
orders with SHB via e-mail and telephone correspondence.  They
also discussed shipment methods and the design of the companies'
websites.

Semenoff and Mangum collectively sent over 140 e-mails to
SHB over the course of three years.[2]  Doc. No. 14.  Ten of those
e-mails were from Semenoff's e-mail address.  The bulk of the e-
mail correspondence was sent from "Debra Mangum at
patchmeup@sbglobal.net."  Doc. No. 14-1.  As shown in the
plaintiff's exhibits, however, on at least one occasion Semenoff
sent an e-mail using Mangum's e-mail address.  Doc. No. 14-3

_____

[2] There may be more email correspondence than that listed on the
exhibits because a computer virus deleted some of SHB's emails
from 2010.  Doc. No. 14.

(documenting an e-mail Semenoff sent to SHB from Mangum's e-mail address stating, "Hi Pete this is (Re-Pete) hope you're doing well out there in NH.").  Also, some e-mails sent from Mangum's e-mail address were actually sent on behalf of both defendants. Doc. No. 14-4 ("Hi Peter, Deb, Pete and Deb here . . . Regards, Peter and (Deb is here standing behind me)").[3]  On dozens of occasions, e-mails from Mangum's address have "Peter" or "Pete" in the subject line, possibly indicating that they were sent by Semenoff.

SHB manufactured hat boxes for the defendants at their plant in New Hampshire and shipped them to PMU in California. According to SHB, the boxes PMU ordered were standard boxes selected from the website; defendants did not request anything unique or unusual.  PMU asked SHB not to label the hat boxes with "SHB."  Instead, on some boxes, SHB printed "Patch Me Up," as requested by defendants.  Between September and March 2012, Mangum ordered ten hat boxes with an insert for holding wine bottles.  This insert was a standard option offered by SHB.

SHB alleges that Mangum asked SHB for the name of its New Hampshire-based web designer, which SHB provided.  In May 2010,

---

[3] Coincidentally, Peter Semenoff and Debra Mangum were communicating with people named Peter and Deborah at SHB.

the web designer sent Mangum a proposal to update L'Artisane
Box's website.  Doc. No. 9-2.  PMU elected not to use the
proposed design.  In 2012, Mangum contacted the New Hampshire-
based web designer again and requested that the web designer
create a website for L'Artisane Box that would be identical to
the SHB website.  The web designer refused.  Instead, in
February 2012, the web designer sent a proposal for an
alternative design.  Id.  Mangum declined the proposal.  Id.

In June 2012, SHB learned that PMU revised its website to
include a link to L'Artisane Box's website and a reference to
hat boxes offered through L'Artisane Box, a division of PMU.
L'Artisane Box's website contains numerous photographs of hat
boxes purchased from SHB.  Text accompanying the photographs
makes several claims about the boxes, including:

> Her [Mangum's] decorative hatboxes are one-of-a-kind
> patented boxes, which have received wide recognition
> and acclaim. . . .  They come with a signed and
> numbered certificate of authenticity. . . . We are the
> manufacturers [sic] and can give you the best price
> and shipping available, period. . . . We have been in
> the press, many magazines, radio, newspapers, and TV.

Doc. No. 8.  The L'Artisane Box website included a list of towns
and states where it has shipped products.  The list included New
Hampshire and, specifically, the towns of Concord, Dover, Derry,
Manchester, Nashua, and Salem.  Doc. No. 9-1.  The website also

5

claimed that the hat boxes are "patented," have "copyright design," and "design patent[s] pending."  SHB alleges that these claims are false because the defendants have never designed a hat box, made a hat box, copyrighted or patented a hat box, or won any awards for hat boxes.

In August 2012, Mangum and Semenoff represented PMU and L'Artisane Box at a booth at the International Gift Show in San Francisco, California.  Mangum and Semenoff placed SHB's boxes prominently around the booth and did not display any other boxes.  When SHB discovered that the defendants were advertising hat boxes purchased from SHB as designed and manufactured by L'Artisane Box, SHB demanded that the defendants stop misrepresenting the origin of the boxes online and at gift shows.

SHB also alleges that PMU and L'Artisane Box offer hat boxes at prices below those charged by SHB to consumers in New Hampshire.  SHB alleges that the defendants intend to fulfill the orders with hat boxes not manufactured by SHB, although PMU's advertisements incorporate SHB hat boxes.  SHB alleges that these other hat boxes are inferior products, not manufactured by hand, not made in the United States, and not manufactured with eco-friendly and non-toxic materials.

6

According to SHB, several New Hampshire consumers have attempted to purchase SHB manufactured boxes from the L'Artisane Box website.  Each time a consumer tries to buy a SHB hat box from the L'Artisane Box website, the defendants provide an excuse for why the order cannot be fulfilled.  In one instance, L'Artisane Box refused an order for two SHB manufactured boxes because one box was allegedly discontinued and they were behind on orders on the other box.  In another instance, Semenoff declined an order for an SHB hat box citing trouble with production machinery.

On September 6, 2012, SHB sued defendants in New Hampshire Superior Court.  On October 19, 2012, the defendants removed the case to this court.

## II.   PERSONAL JURISDICTION

### A.   Standard of Review

When a defendant contests personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of showing that a basis for asserting jurisdiction exists.  See Mass Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997).  Because I have not held an evidentiary

hearing, SHB need only make a prima facie showing that the court
has personal jurisdiction over each defendant with regard to
each of the plaintiff's claims.  See Sawtelle v. Farrell, 70
F.3d 1381, 1386 n.1 (1st Cir. 1995).

　　　To make a prima facie showing of jurisdiction, SHB must
"adduce evidence of specific facts" that support the
jurisdictional claim.  Foster-Miller b. Babcock & Wilcox Canada,
46 F.3d 138, 145 (1st Cir. 1995); see also United Elec. Radio
and Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39,
44 (1st Cir. 1993).  I assume all facts offered by the plaintiff
are true and construe them in the light most favorable to the
plaintiff's claim.  See Mass. Sch. of Law, 142 F.3d at 34;
Foster-Miller, 46 F.3d at 145.  I do not act as fact-finder;
instead, I determine "whether the facts duly proffered, [when]
fully credited, support the exercise of personal jurisdiction."
Rodriguez, 115 F.3d at 84 (citing Boit v. Gar-Tec Prods., Inc.,
967 F.2d 671, 675 (1st Cir. 1992)).

　　　While the prima facie standard is liberal, I need not
"credit conclusory allegations or draw farfetched inferences."
Mass. Sch. of Law, 142 F.3d at 34 (quoting Ticketmaster-N.Y.,
Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).  I also

8

consider facts offered by the defendant, but only to the extent that they are uncontradicted.  See id.

In a removal case such as this one, the plaintiff must meet two requirements for personal jurisdiction.  Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994).  First, the New Hampshire long-arm statute must authorize jurisdiction over the defendant. Second, plaintiff must allege facts to establish that each defendant has contacts with New Hampshire sufficient to give rise to personal jurisdiction under the Due Process Clause of the Fourteenth Amendment.[4]  New Hampshire's long-arm statute authorizes the exercise of jurisdiction to the full extent permitted by the federal Constitution.  Sawtelle, 70 F.3d at 1388; Hemenway v. Hemenway, 159 N.H. 680, 685 (2010).  The defendants do not dispute the applicability of the New Hampshire long-arm statute.  Accordingly, the sole inquiry is whether the

---

[4] The Lanham Act does not have a provision authorizing nationwide service of process, therefore SHB does not base its claim to personal jurisdiction on Federal Rule of Civil Procedure 4(k)(1)(C).  Instead, they base their claim to personal jurisdiction on 4(k)(1)(A), that the defendants are "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Accordingly, I analyze personal jurisdiction under the New Hampshire long-arm statute, which authorizes jurisdiction to extend as broadly as possible to satisfy constitutional requirements.

exercise of personal jurisdiction comports with constitutional standards, and I focus only on the constitutional question.

The Fourteenth Amendment's Due Process Clause precludes a court from asserting jurisdiction over a defendant unless "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The "constitutional touchstone" for personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945)). The inquiry into "minimum contacts" is necessarily fact-specific, "involving an individualized assessment and factual analysis of the precise mix of contacts that characterize[s] each case." Pritzker, 42 F.3d at 60. A defendant cannot be subjected to the forum state's jurisdiction based solely on "random, fortuitous, or attenuated contacts." Burger King, 471 U.S. at 475 (citation and quotations omitted). Rather, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of

10

its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

Personal jurisdiction over a defendant may be general or specific, depending on the nature of the defendant's contacts with the forum state. Carreras v. PMG Collins, L.L.C., 660 F.3d 549, 552 (1st Cir. 2011); Northern Laminate Sales, Inc. v. David, 403 F.3d 14, 24 (1st Cir. 2005) (citation omitted). General jurisdiction exists over a defendant who has engaged in "continuous and systematic" activity in a forum sufficient to establish jurisdiction in that state over all matters including matters unrelated to the defendant's contacts in the forum state. Northern Laminate, 403 F.3d at 24 (citing Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)).  In contrast, specific jurisdiction is narrower in scope and exists only when the cause of action arises from or relates to the defendant's contacts with the forum state.  Id.  In this case, SHB asserts that specific personal jurisdiction applies.

The First Circuit has set forth three factors that apply when analyzing whether specific jurisdiction exists: "relatedness, purposeful availment, and reasonableness." Phillips v. Prairie Eye Center, 530 F.3d 22, 27 (1st Cir. 2008);

11

Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290
F.3d 42, 60 (1st Cir. 2002).  "The plaintiff must demonstrate
that each of these three requirements is satisfied." Phillips,
530 F.3d at 27.

SHB bases its jurisdictional argument on specific
jurisdiction.  Thus, I analyze personal jurisdiction under the
First Circuit's three-part analysis of relatedness, purposeful
availment, and reasonableness.

**B.  <u>Analysis</u>**

Personal jurisdiction must be assessed with regard to each
claim against each defendant.[5]  L'Artisane Box and PMU are a
single corporate entity because L'Artisane Box is a division of
PMU.  Accordingly, the jurisdictional analysis is the same for

---

[5] The parties do not discuss personal jurisdiction with regard to
each claim, but instead discuss it with regards to the claims
collectively.  I analyze personal jurisdiction only for SHB's
Lanham Act claim.  In addition to the Lanham Act claim, SHB also
asserts state law claims for unfair competition and tortious
interference with business.  I need not decide whether SHB has
established jurisdiction over the defendants with respect to
those claims because, finding personal jurisdiction over the
Lanham Act claim, I will exercise pendent personal jurisdiction
over the state law claims since they arise out of the same
common nucleus of operative fact as the Lanham Act claim.  See
Wilcox Indus. Corp. v. Hansen, 11-CV-551-PB, 2012 WL 1246146, *7
(D.N.H. Apr. 13, 2012); 4A Charles Alan Wright & Arthur R.
Miller, Federal Practice and Procedure § 1069.7 (3d ed. 2010).
See also Action Embroidery Corp. v. Atlantic Embroidery, Inc.,
368 F.3d 1174, 1181 (9th Cir. 2004); United States v. Botefuhr,
309 F.3d 1263, 1273 (10th Cir. 2002).

both and I refer to L'Artisane Box and PMU collectively as "the corporation."

To establish that the corporation has sufficient minimum contacts with New Hampshire to support the exercise of personal jurisdiction, SHB may rely on "actions imputed to [PMU and L'Artisane Box] through its agents - as indeed it must, because any action legally attributed to a corporation is that of one agent or another." Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7 (1st Cir. 2002). Semenoff and Mangum were acting on behalf of PMU and L'Artisane Box when they contacted New Hampshire to purchase hat boxes.

While I may find personal jurisdiction over the principal based on the actions of the agents, an agent ordinarily cannot be made subject to personal jurisdiction based on the acts of a principal. This court does not have personal jurisdiction over Mangum or Semenoff simply because they are agents of the corporation. Accordingly, I analyze their contacts with New Hampshire independently.

1.   Relatedness

The relatedness inquiry asks whether "the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." Harlow v. Children's Hosp., 432 F.3d 50,

13

61 (1st Cir. 2005).  It is a "flexible, relaxed standard," Pritzker, 42 F.3d at 61, considered "through the prism" of the plaintiff's claims.  Sawtelle, 70 F.3d at 1389.  In the context of tort claims, the court "must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." Phillips Exeter Acad., 196 F.3d at 289.  This "requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contact between the defendant and the forum state."  Sawtelle, 70 F.3d at 1389.

In the First Circuit, to determine whether a plaintiff's tort claim meets the relatedness prong, I ask whether "the injury would not have occurred 'but for' the defendant's forum activity" (cause-in-fact) and whether "the defendant's in-state conduct gave birth to the cause of action" (proximate cause). Mass. Sch. of Law, 142 F.3d at 35.  Accordingly, I identify the defendant's alleged contacts with the forum state and then consider whether those contacts are both the cause-in-fact and proximate cause of the plaintiff's injury.

The corporate defendants' relevant contacts with New Hampshire, as alleged by the plaintiff, include: more than one hundred e-mail and telephone communications over the course of a

three-year relationship directed to SHB in New Hampshire
involving negotiations about the sale of hat boxes from New
Hampshire; a history of eleven purchase orders of hat boxes from
New Hampshire spanning the years 2009 to 2012; and a website
soliciting business from New Hampshire residents using images of
the hat boxes purchased from New Hampshire.

The corporation's contacts are the cause-in-fact of the
injury claimed by SHB; SHB's Lanham Act claims would not exist
but for the defendants' activities in New Hampshire.  The more
complicated question is whether the corporation's contacts are
the proximate cause of SHB's cause of action.

The touchstone of the proximate cause inquiry is the
distinction between foreseeable and unforeseeable risks of harm.
See Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 715 (1st
Cir. 1996); Peckham v. Continental Casualty Ins. Co., 895 F.2d
830, 836 (1st Cir. 1990); see also Palsgraf v. Long Island
Railroad Co., 248 N.Y. 339, 354 (1928).  As the First Circuit
noted, however, the standards for proximate cause may be
loosened when circumstances require.  Nowak, 94 F.3d at 716 ("We
think such flexibility is necessary in the jurisdictional
inquiry: relatedness cannot merely be reduced to one tort
concept for all circumstances.").  With this in mind, I analyze

15

the nexus between the corporation's contacts with New Hampshire
and SHB's injury.

Over the course of a three-year relationship, the
corporation placed several calls and sent hundreds of e-mails to
negotiate the purchase of hundreds of hat boxes from SHB in New
Hampshire.  PMU used the hat boxes it purchased from New
Hampshire to prepare the allegedly misleading advertisements.
PMU's intention upon purchasing the hat boxes was to resell
them, so it was foreseeable that PMU would advertise and market
the hat boxes it purchased.  The harm SHB alleges arose directly
from the defendants' decision to contact SHB in New Hampshire to
purchase hat boxes and to use SHB's hat boxes from New Hampshire
to prepare the allegedly false marketing.  The corporation
allegedly copied SHB's designs from New Hampshire.  They also
contacted SHB's New Hampshire-based web designer to request that
the web designer build a website imitating SHB's web design.

Even if the corporation's negotiations, purchase orders,
and contact with the web designer in New Hampshire were
insufficient to constitute the proximate cause of SHB's
injuries, the harm arose, in part, because the L'Artisane Box
website targeted New Hampshire residents.  The relatedness
element is met when a website intended to be viewed in New

16

Hampshire causes harm in New Hampshire.  See Gather, Inc. v. Gatheroo, L.L.C., 443 F. Supp. 2d 108, 115 (D. Mass. 2006).  The L'Artisane Box website stated that the company sells hat boxes in six cities and towns in New Hampshire.  As plaintiff's counsel explained at oral argument, by listing cities and towns in New Hampshire, the L'Artisane Box website is designed to appear in New Hampshire consumers' search results.  The corporation intended to serve the New Hampshire hat box market and directed its website to New Hampshire consumers.  SHB also alleges that New Hampshire customers have tried to purchase hat boxes from the L'Artisane Box website.  SHB cites at least two instances when New Hampshire consumers attempted to buy hat boxes from L'Artisane.  Accordingly, the defendant designed the website to reach into New Hampshire and in doing so caused harm to SHB in New Hampshire.

The individual defendants, Mangum and Semenoff, also have sufficient contacts with New Hampshire to meet the relatedness prong of the minimum contacts analysis.  As the e-mail correspondence demonstrates, both Mangum and Semenoff personally participated in the negotiations with SHB.  There are 132 e-mails sent from Mangum's e-mail address to SHB.  Doc. No. 14-1.  Mangum reached out to the web designer in New Hampshire and

negotiated the purchase of hat boxes from SHB.

While there are only ten e-mails sent from Semenoff on the e-mail log, it is clear from the alleged facts that he was closely involved in the negotiation and purchase of hat boxes from New Hampshire.  Doc. No. 14-2.  As explained above, some of the e-mails sent from Mangum's e-mail address were actually sent by both defendants.  SHB alleges that Semenoff called SHB in New Hampshire to discuss buying hat boxes, shipping the hat boxes, and the companies' websites.  Doc. No. 8.  As the president of PMU, Semenoff had an ongoing relationship with SHB.  Id. Defendants do not argue that personal jurisdiction is improper with regards to Semenoff because he was less involved with the business than any of the other defendants.  I find that Semenoff's contacts with New Hampshire meet the relatedness requirement.

2.  Purposeful Availment

"The function of the purposeful availment requirement is to [ensure] that personal jurisdiction is not premised solely on a defendant's 'random, isolated, or fortuitous' contacts with the forum state."  Sawtelle, 70 F.3d at 1391 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). Voluntariness and foreseeability are the touchstones of the

analysis.  Id.  The purposeful availment inquiry often resembles the relatedness inquiry.  Phillips Exeter Acad., 196 F.3d at 289 ("[T]here is a natural blurring of the relatedness and purposeful availment inquiries in cases . . . in which the alleged contacts are less tangible than physical presence.").

Defendants argue that purchasing products from a foreign jurisdiction does not constitute purposeful availment, and that they could not reasonably have foreseen being haled into New Hampshire court based on that activity.  SHB argues that defendants voluntarily subjected themselves to suit in New Hampshire and that the defendants' false advertisements caused foreseeable harm to SHB in New Hampshire.[6]

Defendants' communications directed to New Hampshire were not random, isolated, or fortuitous.  See Keeton, 465 U.S. at 774.  The contacts were knowing and purposeful.  Many of the

---

[6] SHB also cites the forum selection clause at the bottom of the invoices as evidence that defendants knew they could be subject to suit in New Hampshire.  A boilerplate forum selection clause is not sufficient to establish personal jurisdiction, but it is a factor that may be considered to "reinforce . . . the reasonable foreseeability of possible litigation."  Burger King, 471 U.S. at 482.  Defendants argue that the forum selection clause found on the invoices is limited to claims "involving this contract" and therefore is inapplicable to the present tort claim.  I find that defendants meet the "purposeful availment" requirement and therefore do not consider the forum selection clause.

same knowing and purposeful contacts discussed in the

relatedness inquiry above are relevant here.  At the time they

placed orders for hat boxes, the defendants knew SHB was a New

Hampshire corporation.  Thus, the defendants could have foreseen

that, should a claim arise, they would likely be haled into

court in New Hampshire.

### 3.  Reasonableness

Once a court has determined that a defendant has

purposefully established minimum contacts with the forum state,

other factors are relevant to determining whether the assertion

of personal jurisdiction would comport with "fair play and

substantial justice."  Burger King, 471 U.S. at 476 (quoting

Int'l Shoe, 326 U.S. at 320).  The relevant factors for

consideration include:

> (1) the defendant's burden of appearing, (2) the forum
> state's interest in adjudicating the dispute, (3) the
> plaintiff's interest in obtaining convenient and
> effective relief, (4) the judicial system's interest
> in obtaining the most effective resolution of the
> controversy, and (5) the common interests of all
> sovereigns in promoting substantive social policies.

163 Pleasant St., 960 F.2d at 1088 (citing Burger

King, 471 U.S. at 477).

20

These factors "are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice.  In very close cases, they may tip the constitutional balance."  Ticketmaster, 26 F.3d at 209.  Here, I find these factors do not weigh strongly in either direction and, accordingly, do not tip the constitutional balance.

Defendants argue that it would be unfair and unreasonable to require them to defend this action in New Hampshire for several reasons.  First, they argue that the burden of litigating this case would be particularly great for Mangum because she has an autonomic disease, which they neither specify nor document, that prevents her from traveling.[7]  Mangum does not need to travel to New Hampshire to litigate this case.  This case is unlikely to proceed to trial, but if it does and if Mangum must testify, she may do so via videoconference.

The defendants' burden of litigating this case in New Hampshire falls short of constitutional significance.  Burger King, 471 U.S. at 474 (explaining that "it usually will not be

---

[7] Defendants cite Murphy v. Schneider Nat'l Inc., 362 F.3d 1133, 1142 (9th Cir. 2004) for the proposition that a combination of physical and financial hardships may effectively deprive a party of his or her day in court.  Murphy, however is inapposite because it addresses venue, not personal jurisdiction.

unfair to subject [a nonresident defendant] to the burdens of litigating in another forum for disputes relating to [in-forum economic] activity"). If the litigation were to proceed in California, as the defendants wish, the burden of traveling from New Hampshire to California would be felt by the plaintiffs. Either way, one party will have the burden of traveling across the country.

Second, New Hampshire has a demonstrable interest in adjudicating the dispute. As the First Circuit has noted, "[t]he purpose of [this] inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest." Foster-Miller, Inc., 46 F.3d at 151 (emphasis in original). New Hampshire has an interest in the prosecution of this case involving an out-of-state defendant that contacted a New Hampshire business, obtained hat boxes from the New Hampshire business, and then allegedly injured the New Hampshire business by falsely advertising those hat boxes. Accordingly, this factor cuts in favor of jurisdiction.

Third, SHB has an interest in obtaining convenient and effective relief in its home state. I need not dwell on this factor because "plaintiff's choice of forum must be accorded a

degree of deference with respect to the issue of convenience."
Sawtelle, 70 F.3d at 1395.

Fourth, the judicial system's interest in obtaining the
most effective resolution of the controversy does not appear to
cut in either direction here, as is frequently the case.  See
Jet Wine & Spirits, 298 F.3d at 12; Sawtelle, 70 F.3d at 1395;
Ticketmaster, 26 F.3d at 211.  The loci of discovery will be in
both New Hampshire and California.

The fifth and final factor, which implicates the common
interests of all sovereigns in promoting substantive social
policies, weighs in favor of finding jurisdiction in New
Hampshire.  The policy implicated by the final factor is "the
ability of a state to provide a convenient forum for its
residents to redress injuries inflicted by out-of-forum actors."
Sawtelle, 70 F.3d at 1395.  When a company does business in New
Hampshire, state tort law may be frustrated if out-of-state
actors are insulated from the legal consequences of their
actions in New Hampshire.  Jet Wine & Spirits, 298 F.3d at 12.
Hence, this factor weighs in favor of the exercise of
jurisdiction.

Overall, the reasonableness factors do not weigh strongly
in either direction.  Because SHB's injury is related to the

defendants' contacts with New Hampshire, and the defendants
purposefully availed themselves of the benefits of doing
business in New Hampshire, I find that this court has
jurisdiction over SHB's Lanham Act claim, and, under
supplemental jurisdiction, the plaintiff's state law claims.


### III.  VENUE

### A.  Standard of Review

While the First Circuit has not specified the standard a
district court should use to resolve venue disputes, it has
determined the standard in the related context of a challenge to
personal jurisdiction.  See Boit, 967 F.2d at 675-77.  In that
context, in cases in which no hearing is held, the plaintiff
must make only a prima facie determination of jurisdiction.  Id.
Accordingly, the court does not find facts, but rather accepts
the truth of the plaintiff's factual averments to the extent the
record supports them.  Id.  Since at least one other circuit
court requires district courts within its circuit to use a
similar standard in venue disputes, see Home Ins. Co. v. Thomas
Indus., Inc., 896 F.2d 1352, 1355 (11th Cir. 1990), and the
parties have not drawn my attention to any precedent suggesting

a different approach, I will determine the venue question under the prima facie standard outlined in Boit.

**B.   Analysis**

Both venue and personal jurisdiction are concerned with fairness to the defendant, but the two concepts are distinct. Johnson Creative Arts v. Wool Masters, 743 F.2d 947, 952 (1st Cir. 1984).  The fact that a court asserts personal jurisdiction over a defendant is not dispositive of the issue of venue.  Id.

The proper venue for an action under the Lanham Act is determined by 28 U.S.C. § 1391, the general venue statute for non-diversity actions.[8]  Woodke v. Dahm, 70 F.3d 983, 985 (8th Cir. 1995); Gary Scott Int'l, Inc. v. Baroudi, 981 F. Supp. 714, 717-18 (D. Mass. 1997).

Section 1391(b)(1) provides that a civil action may be brought in "a judicial district in which any defendant resides." 28 U.S.C. §1391(b)(1).  Section 1391(c)(2) provides that a defendant corporation "shall be deemed to reside . . . in any judicial district in which [it] is subject to the court's personal jurisdiction. . ."  Id. §1391(c)(2).  Since I found

---

[8] SHB errs in relying on 28 U.S.C. § 1400(a), the venue provision for "patents and copyrights, mask works, and designs."

personal jurisdiction over PMU and L'Artisane Box, venue is also proper.

With regard to the individual defendants, Mangum and Semenoff, section 1391(b)(2) provides that a claim may be brought in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Id. § 1391(b)(2).  The relevant question is "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." Setco Enter. Corp. v. Robbins, 19 F.3d 1278, 1281 (8th Cir.1994).  I look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001).

For the same reasons I conclude that there is specific personal jurisdiction over the individual defendants based on their contact with New Hampshire, I also find that a substantial part of the events or omissions giving rise to SHB's claim occurred in New Hampshire.  See 28 U.S.C. § 1391(b)(2). Accordingly, venue is proper in New Hampshire for all defendants.

26

## IV.   FAILURE TO STATE A CLAIM

### A.   Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must make factual allegations sufficient to "state a claim for relief that is plausible on its face."  See Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations omitted).

In deciding a motion to dismiss, I employ a two-pronged approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  First, I screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (citations, internal quotation marks, and alterations omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  Second, I credit as true all non-conclusory

factual allegations and the reasonable inferences drawn from
them, and then determine if the claim is plausible.  Id.  The
plausibility requirement "simply calls for enough fact to raise
a reasonable expectation that discovery will reveal evidence" of
illegal conduct.  Twombly, 550 U.S. at 556.  The "make-or-break
standard" is that those allegations and inferences, taken as
true, "must state a plausible, not a merely conceivable, case
for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d
25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555 ("Factual
allegations must be enough to raise a right to relief above the
speculative level.").

**B.   Analysis**

   1.  Violation of the Lanham Act (Count II)

   Defendants argue that the plaintiff failed to properly
allege a violation of the Lanham Act's prohibition on false
advertising.  See 15 U.S.C. § 1125(a).  To state a claim under
this statute, a plaintiff must allege:

> (1) a false statement of fact by the defendant in a
> commercial advertisement about its own or another's
> product; (2) the statement actually deceived or has
> the tendency to deceive a substantial segment of its
> audience; (3) the deception is material, in that it is
> likely to influence the purchasing decision; (4) the
> defendant caused its false statement to enter
> interstate commerce; and (5) the plaintiff has been or
> is likely to be injured as a result of the false

> statement, either by direct diversion of sales from
> itself to defendant or by a lessening of the goodwill
> associated with its products.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

"A plaintiff can succeed on a false advertising claim by proving either that an advertisement is false or that the advertisement is literally true or ambiguous, but likely to mislead and confuse consumers." Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 (1st Cir. 2000).  If the advertisement is false, the plaintiff may be entitled to relief without evidence of consumer reaction.  Id.  If the advertisement is literally true, the plaintiff must show that the advertisement conveys a misleading message that is likely to confuse consumers and show how consumers have actually reacted to the challenged advertisement.  Id.

Defendants argue that SHB has failed to allege a violation of the Lanham Act because: (1) no advertising claim made by PMU or L'Artisane is false or misleading; (2) SHB knew that PMU intended to rebrand the boxes under PMU's own label; and (3) SHB's hat boxes are not protected under the Lanham Act because

they are not distinctive.[9]  These are all factual issues that do
not bear on the sufficiency of the pleadings.

SHB alleges that the defendants placed pictures of SHB hat
boxes on the PMU and L'Artisane Box websites and stated on the
websites that the boxes were designed, manufactured,
copyrighted, and patented by Mangum or L'Artisane Box.  The
complaint alleges that these and other similar statements are
false.  SHB alleges that defendants misled consumers by claiming
that the SHB boxes were "patented" by Mangum.  They argue that
such a statement is not only false, but would also mislead
consumers to believe that defendants are the only source of SHB
hat boxes.  SHB knew that defendants would rebrand and resell

---

[9] Defendants incorrectly cite Zenith Electronics Corp. v. Exzec,
Inc. for the proposition that a plaintiff must allege bad faith
in a Lanham Act claim if the marketplace statements are about
having a patent.  182 F.3d 1340 (Fed. Cir. 1999).  In Zenith,
the Court of Appeals for the Federal Circuit held that "before a
patentee may be held liable under § 43(a) for marketplace
activity in support of its patent, and thus be deprived of the
right to make statements about potential infringement of its
patent, the marketplace activity must have been undertaken in
bad faith."  Id. at 1353.  The court was concerned that the
Lanham Act may conflict with the patent laws when an accused
patent infringer attempts to use antitrust law to frustrate an
honest patentee's right to enforce a patent.  Zenith is not on
point in this case because defendants do not hold a valid
patent.  I do not decide whether there is a bad faith
requirement for "patent pending" claims under the Lanham Act.
The patent pending claims are only one of several alleged
violations of the Lanham Act.

the hat boxes, but they did not consent to the allegedly
deceptive and misleading way that defendants advertised the
boxes.

In a motion to dismiss, I assume all of the allegations in
the complaint are true.  The defendants have challenged the
plaintiff's factual allegations, but not plaintiff's legal
claims.  Assuming SHB's allegations are true, the defendants
have not offered any argument that the pleadings are
insufficient to state a claim under the Lanham Act.
Accordingly, their motion to dismiss is denied.

   2.  Unfair Competition in Violation of NH CPA (Count I)

Section 358:A-2 of the CPA provides, in relevant part, that
"[i]t shall be unlawful for any person to use any unfair method
of competition or any unfair or deceptive act or practice in the
conduct of any trade or commerce within the state."  N.H. Rev.
Stat. Ann. § 358-A:2.  Acts in violation of the CPA include:
"(I) Passing off goods or services as those of another; (II)
Causing likelihood of confusion or misunderstanding as to the
source, sponsorship, approval, or certification of goods or
services; . . . (IX) Advertising goods or services with intent
not to sell them as advertised; (X) Advertising goods or
services with intent not to supply reasonably expectable public

31

demand, unless the advertisement discloses a limitation of quantity."  New Hampshire RSA 358-A:10 provides that "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper."  Accordingly, a competitor may bring suit under the CPA.  See Pacamor Bearings, Inc. v. Minebea Co., 918 F. Supp. 491, 499 (D.N.H. 1996).

A plaintiff must prove that an injury was felt, either directly or indirectly, in New Hampshire in order to state a claim under the CPA.  Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 343 (D.N.H. 2012).  SHB alleges that the defendants made the false or misleading statements on their website and used the website to solicit New Hampshire consumers by listing several New Hampshire towns where L'Artisane Box allegedly conducted business.  In other words, New Hampshire residents were the targets of defendants' allegedly false and misleading information.

Defendants move to dismiss this claim.  An alleged violation of the Lanham Act provision prohibiting false advertising will also constitute an "unfair practice" within the meaning of the CPA.  See Pacamor Bearings, Inc., 918 F. Supp. at

499.  Accordingly, for the same reasons discussed above in the section on the Lanham Act, plaintiff has pleaded sufficient facts to support a claim under the CPA.  Defendants' motion to dismiss is denied.

    3.   <u>Tortious Interference with a Business (Count III)</u>

    Plaintiffs allege that the defendants' intentional misrepresentations caused SHB to "lose customer orders and suffer damages because the public perceived that defendants were manufacturers of SHB's pictured boxes as well as the owner of copyrights, patents and awards on the boxes."  Doc. No. 9.  It is unclear whether SHB is asserting a claim for tortious interference with an existing contractual relationship or tortious interference with a prospective contractual relationship.  Either way, the claim must fail.

    To state a claim for tortious interference with an existing relationship, the plaintiff must allege that: "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference."  <u>Emery v. Merrimack Valley Wood Prods., Inc.</u>, 701 F.2d 985, 988 (1st Cir. 1983).  SHB fails to allege an existing economic

relationship with a third party.

To state a claim for tortious interference with a prospective contractual relationship under New Hampshire law the plaintiff must show that the defendant "induce[d] or otherwise purposely cause[d] a third person not to . . . enter into or continue a business relation with another" and thereby caused harm to the other. Bricker v. Crane, 118 N.H. 249, 252 (1978) (quoting Restatement (Second) of Torts § 766(B) (1979)). The claim cannot be based "solely on [a plaintiff's] *potential* relationship with consumers in a given market." Fuller Ford, Inc. v. Ford Motor Co., No. 00-530-B, 2001 WL 920035, at *14 (D.N.H. Aug. 6, 2001) (emphasis in original). It arises only when a third party interferes with the ongoing or prospective business relations of two other parties. Emery, 701 F.2d at 988 (citations omitted); Alexander v. Fujitsu Bus. Commc'n Sys., Inc., 818 F.Supp. 462, 468-69 (D.N.H. 1993); Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46 (1987). SHB fails to allege that the defendants interfered with ongoing or prospective business relations with a third party. Accordingly, the claim fails.

## V.  CONCLUSION

For the reasons discussed above, I deny defendants' motion

to dismiss (Doc. No. 5) for lack of personal jurisdiction, improper venue, and failure to state a claim under the Lanham Act and CPA.  I grant defendants' motion to dismiss for failure to state a claim of tortious interference with business.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 12, 2013

cc:   Daniel A. Laufer
      Paul David Marotta
      Joshua M. Wyatt

35